IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>JEFFREY M. RINDONE,<br><br>      Defendant. | 4:15-CR-3083<br><br>PRELIMINARY RESTITUTION FINDINGS |

  This matter is before the Court for a preliminary assessment of the amount of restitution to be awarded pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. §§ 3613A, 3663A. The Court's preliminary finding, for the reasons explained below, is that restitution shall be ordered in the amount of $258,023.87.

  The victim of the offense is Westgate Bank, which was in the business of providing residential construction loans. A builder proposing to build a home would obtain a loan for each residential property. The Bank would set up a line of credit, and create a budget spreadsheet detailing the line items and different areas of work to be completed on the house. Then, as the house was built, the builder would provide the Bank invoices from the subcontractors who had performed work on the house or, if the builder had already paid the subcontractor, an invoice and a copy of the check paid by the contractor. The Bank would review the invoice against the spreadsheet to make sure that the house wasn't over budget, then approve a draw on the line of credit. A check for the draw would be cut to the title company, who would then issue individual checks to the subcontractors. In other words, the draw requests were for work already done or materials already purchased, not for work yet to be performed or materials yet to be acquired.

  The defendant, Jeff Rindone, and his brother Scott Rindone, had a number of construction loans with the Bank during 2012 and 2013. But sometime around April 2013, the Rindones began writing checks to subcontractors that overdrew their Westgate bank account. For a time, the Bank permitted payment on those overdrafts; the check would be paid, the title company would issue a check to the Rindones to reimburse them for the payments made to subcontractors, and the Rindones would deposit those funds into their Westgate account to bring it back into the black. Then, at some point in 2013, the Bank become concerned that some of the Rindones'

subcontractors weren't getting paid. Subcontractors began filing liens against the properties. In July 2013, the Bank decided to stop paying the Rindones' overdrafts. And finally, in early 2014, the Bank stopped lending the Rindones money and took over the properties.

Unknown to the Bank, the Rindones had been drawing on their lines of credit with phony checks, presenting them to Westgate as proof of payment to subcontractors who had, in fact, not been paid with those checks. It was revealed that the Rindones were engaged in a shell game, presenting false claims to the Bank so they could draw on the line of credit for one property to obtain funds they could use for other purposes. (The defendant told the probation officer that they underbid on several homes.) The phony checks add up to $258,023.87. Exhibit 1.

The question, then, is what the Bank's actual losses are, for purposes of assessing restitution.[1] Although the government bears the burden of proving the restitution amount by a preponderance of the evidence, 18 U.S.C. § 3664(e), the Court is charged with reasonably estimating the loss when the amount lost through fraud is difficult to estimate, *United States v. Adejumo*, 848 F.3d 868, 2017 WL 629291, at *2 (8th Cir. Feb. 16, 2017). Restitution is compensatory, not punitive, and in a fraud case, it is limited to the actual loss directly caused by the defendant's criminal conduct in the course of the scheme alleged in the indictment. *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012). Restitution may only be awarded for the loss caused by the specific conduct that is the basis of the offense of the conviction. *United States v. DeRosier*, 501 F.3d 888, 896 (8th Cir. 2007). The amount of restitution cannot exceed the actual, provable loss realized by the victims. *United States v. Martinez*, 690 F.3d 1083, 1088 (8th Cir. 2012); *see Adejumo*, 2017 WL 629291, at *1. And the causal connection between the defendant's acts and the victim's losses must not be unreasonably extended. *United States v. Spencer*, 700 F.3d 317, 323 (8th Cir. 2012). Restitution for funds not actually lost by a victim would be an impermissible windfall, so a bank may therefore recover restitution only to the extent sufficient evidence has proven its ultimate loss. *Adejumo*, 2017 WL 629291, at *1.

The government's argument is straightforward: based on fraudulent representations, the Bank provided the Rindones with $258,023.87 that, but for the fraud, it would not have. So, the government says, that's the amount of restitution which should be awarded. *See* filing 63 at 5. But, as the

---

[1] The parties have not objected to the presentence report's assessment of the loss, for Sentencing Guidelines purposes, as $182,450. But, although the gross amounts of loss for sentencing purposes and loss for restitution purposes are often calculated in the same manner, the two determinations serve different purposes and thus may differ depending on the relevant facts. *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010).

defendant points out, the situation is a little more complicated, because the money was paid out on lines of credit that were *secured* by the property, and that collateral was eventually sold to recover some of the money the Bank loaned the Rindones. Complicating matters is the fact that in the end, after completing and selling the properties, the Bank lost nearly $370,000 on the Rindones' loans—meaning that some of those losses must have been attributable to something besides fraud.[2] *See* Exhibit 6.

Had the transactions stopped with the approval of the Rindones' fraudulently obtained draws, the situation would be as simple as the government makes it out to be. But, instead, the Bank took over the properties and sold them. Some, it even completed construction on. The question is, should some of those proceeds be offset against the amount the Rindones obtained by fraud? The Supreme Court's decision in *Robers v. United States* suggests that the Court must at least consider that question. 134 S. Ct. 1854 (2014).

In *Robers*, the defendant was convicted of fraud after he submitted fraudulent loan applications to two banks and obtained about $470,000. *Id.* at 1856. He defaulted and the banks foreclosed, but in a falling real estate market, the banks were only able to sell the houses for about $280,000. *Id.* The Supreme Court noted that the MVRA requires offenders to restore property lost as a result of crime, and when return is impractical or inadequate, "the offender must pay the victim an amount equal to the value of the property less the value (as of the date the property is returned) of any part of the property that is returned." *Id.* at 1856 (citing § 3663A(b)(1)(B)) (quotations omitted). And the Court held that when collateral is sold to recover money lent as the result of a fraudulently obtained loan, "a sentencing court must reduce the restitution amount by the amount of money the victim received in selling the collateral." *Id.*

As a basic principle, it is clear from *Robers* (and, indeed, from the statute itself) that any of the fraudulently obtained funds that were actually recovered by the Bank from its later sale of collateral should be offset against the Bank's initial loss. *See*, *id.*; *United States v. Oladimeji*, 463 F.3d 152, 160 (2d Cir. 2006); *United States v. Shepard*, 269 F.3d 884, 887-88 (7th Cir. 2001). But unlike *Robers*, this case presents an apportionment problem: the loans themselves were not obtained fraudulently, only some of the draws. Some of that money may have been spent on improvements to other properties and recovered, eventually, by sale of the collateral. But, how much? The

---

[2] Although the Bank spent money to complete construction on some of the properties after taking them over, see Exhibit 6, there is neither evidence nor argument to suggest that the Bank's decisions to do so were financially imprudent. *See* filing 64 at 7.

defendant says that we don't have the information we need to figure that out—so, he says, the Court should deny restitution altogether. *See* filing 64 at 11.

That result, the Court cannot accept. The MVRA is intended to assure that victims of a crime receive full restitution. *See Dolan v. United States,* 560 U.S. 605, 612 (2010). And the Court need not calculate the net loss precisely, so long as it can be reasonably estimated. *Adejumo,* 2017 WL 629291, at \*2. Nor does the burden of proof necessarily run against the government: "[t]he MVRA does not stipulate which party bears the burden of proving entitlement to an offset." *United States v. Ruff,* 420 F.3d 772, 775 (8th Cir. 2005). The initial burden of demonstrating the amount of the loss is on the government, but "[o]n other matters, the burden 'shall be upon the party designated by the court as justice requires.'" *Id.* at 775-76 (quoting § 3664(e)).

In other words, while the government bears the burden of demonstrating the amount of the loss sustained as a result of the offense, the defendant bears the burden of establishing entitlement to an offset against that loss. *United States v. Miell,* 744 F. Supp. 2d 961, 965 n.8 (N.D. Iowa 2010); *see Ruff,* 420 F.3d at 775 (remanding for trial court to determine if *defendant* could establish right to offset); *see also, Robers,* 134 S. Ct. at 1861 (Sotomayor, J., concurring); *United States v. Malone,* 747 F.3d 481, 486 (7th Cir. 2014); *United States v. Bane,* 720 F.3d 818, 828 (11th Cir. 2013); *United States v. Bryant,* 655 F.3d 232, 254 (3d Cir. 2011); *United States v. Elson,* 577 F.3d 713, 734 (6th Cir. 2009); *United States v. Serawop,* 505 F.3d 1112, 1127 (10th Cir. 2007); *United States v. Karam,* 201 F.3d 320, 326 (4th Cir. 2000); *United States v. Parsons,* 141 F.3d 386, 393 (1st Cir. 1998); *United States v. Sheinbaum,* 136 F.3d 443, 449 (5th Cir. 1998); *cf., United States v. Boccagna,* 450 F.3d 107, 120 n.9 (2d Cir. 2006); *United States v. Pugh,* 445 F.3d 1066, 1068 (8th Cir. 2006) (burden is on defendant to show payment of restitution debt); *United States v. Crawford,* 169 F.3d 590, 593 (9th Cir. 1999). In this case, while it seems possible, or even likely, that some of the Bank's loss was made up in the end from selling the properties, there is no evidence to prove that, much less evidence of how much.

It is clear, though, that the Bank did pay out $258,023.87 to the Rindones that it would not have, absent fraud. Exhibit 1. And, the Supreme Court has explained, "[t]he traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred 'but for' the former." *Paroline v. United States,* 134 S. Ct. 1710, 1722 (2014). So, *Paroline,* in a comparable statutory context, the Court explained that a showing of but-for causation was sufficient to prove proximate cause for purposes of restitution. *Id.*

- 4 -

After the fraud, the Bank ended up spending a total of $2,479,992.95 on the properties (between the amount spent by the Rindones and the amount it spent after it seized the properties). Exhibit 6. Then, the Bank sold the properties for a total of $2,110,100, resulting in a net loss of $369,892.95. Exhibit 6. The losses beyond those attributable to fraud could have been caused by any number of things, including underbid contracts, mismanagement, or market conditions; none of those warrant restitution. But in the absence of any evidence specifically showing how some of the properties' eventual market value was the product of improvements made to the properties by fraudulently obtained funds, the Court is left with this conclusion: the fraudulently obtained funds would not have been paid to the Rindones, but for their fraud, and the evidence does not show that any of the funds were returned. So, the Bank's proven loss is $258,023.87, and that is the amount that the Court tentatively finds will be awarded as restitution.

IT IS ORDERED:

1. The Court's tentative finding is that restitution should be ordered in the amount of $258,023.87.

2. On or before March 17, 2017, the parties shall confer and contact the undersigned's judicial assistant for purposes of scheduling the defendant's sentencing hearing.

3. Any objections to this tentative finding shall be filed as soon as is practicable, but in no event later than 7 days before the defendant's sentencing.

Dated this 10th day of March, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge